IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 03-CV-777-GMS ) ) |
| RITE AID CORPORATION, | ) ) ) |
| Defendant. | ) |

**MEMORANDUM**

**I.   INTRODUCTION**

On August 5, 2003, the Equal Employment Opportunity Commission ("EEOC") initiated the present action on behalf of Zarin Din against her former employer, Rite Aid Corp. ("Rite Aid"), alleging unlawful religious discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* (D.I. 1.) Presently before the court is Rite Aid's motion for summary judgment. (D.I. 34.) For the following reasons, the court will grant summary judgment in favor of the defendant.

**II.   JURISDICTION**

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (1993).

**III.   STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 392 (3d Cir. 1998). Thus,

summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle*, 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.*; *see also Assaf v. Fields*, 178 F.3d 170, 173-74 (3d Cir. 1999).

IV. **BACKGROUND**

In the summer of 2001, Shannon Lee, a pharmacist at a Rite Aid store in Delaware, hired Huma Din ("Huma"), a Muslim college student on summer vacation, as a part-time pharmacy technician. When Lee hired Huma, there was no mention of Huma's religion. However, at some point during the summer of 2001, Huma disclosed her religious beliefs to Lee and another pharmacy technician, Susan Yoder, in response to their questions about why Huma would not wear shorts in the summer or eat the pepperoni pizza Lee had ordered for the pharmacy staff. Huma explained to them that Muslims keep their bodies covered for modesty reasons and that they do not eat pork. In spite of this explanation, Lee continued to order pepperoni pizzas for the pharmacy staff on several subsequent occasions.

When it came time for Huma to return to school in the fall, she suggested her mother, Zarin Din ("Din"), as a suitable replacement. Thus, on September 13, 2001, Lee took Huma's suggestion and hired Din on a part-time basis. Within a few months of Huma's departure, Din transitioned to a full-time, Monday-through-Friday schedule. In the summer of 2002, when Huma returned for summer vacation, she was re-hired by Lee. Lee also mentioned to Huma that "it was nice" having

Din at the pharmacy because she did a "good job." (Huma Aff. ¶ 5.)

However, prior to Huma's return, Din noticed that Lee had become more distant and began to favor Yoder after Din returned from celebrating a religious holiday known as Eid al-Fitr in late 2001. Lee also began discouraging Din from doing more work than Yoder. Din was insulted by Lee's discouraging attitude because Din viewed her employment as more than a job – she wanted to make it her career. To that end, Din pursued a pharmacy technician certificate in her spare time. Before doing so, Lee told Din that Rite Aid would increase her pay from $8.25/hour to $15/hour if she successfully completed the certification course. But after Din completed the course in September 2002, Lee informed Din that Rite Aid would only pay $10/hour. This prompted Din to say that she might look for another job. Shortly thereafter, Mark Byan was hired as a part-time pharmacy technician – ostensibly to replace Din.

But, by November 2002, Din was still working full time at Rite Aid. On the evening of November 21, Din requested time off for Eid al-Fitr, as she had done the year before. This time, rather than granting the request, Lee informed Din that she was terminated. Within a few days, Lee wrote a letter to her regional supervisor, Frank Tiano, summarizing Din's performance problems over the course of the past year. In that letter, no mention was made of Din's threat to look for a new job in September. The letter also failed to mention that Din had received a perfect score on a feedback form filled out by an anonymous customer, and a few $5 gift cards from Rite Aid for good performance. Din made her own attempts to contact Tiano because she wanted a transfer, but she was ultimately unsuccessful. Then, in mid-December, Din filed a Charge of Discrimination with the EEOC alleging that she was terminated because of her religious beliefs. The present action is the culmination of that complaint.

V.  DISCUSSION

"*McDonnell Douglas* [*v. Green*, 411 U.S. 792 (1973)] and subsequent decisions have 'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.' *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). First, the plaintiff must establish a prima facie case of discrimination. *Ibid.*; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the plaintiff is successful in this endeavor, the burden shifts to the defendant "to 'produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.' *Burdine, supra*, at 254. This burden is one of production, not persuasion; it 'can involve no credibility assessment.' *St. Mary's Honor Center, supra*, at 509." *Reeves*, 530 U.S. at 142.

"Although intermediate evidentiary burdens shift back and forth under this framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' *Burdine*, 450 U.S. at 253. And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' *Ibid.*; *see also St. Mary's Honor Center*, 509 U.S. at 507-508. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' *Burdine, supra*, at 256." *Reeves*, 530 U.S. at 143. "Proof that the defendant's explanation is

4

unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.

"This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* (emphasis in original). "Whether [summary] judgment . . . is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for [summary] judgment. . . ."[1] *Id.* at 148-49.

Here, because Din was terminated in response to her request for time off for an Islamic holiday, Rite Aid does not dispute that the EEOC has established a prima facie case of religious discrimination. (D.I. 35 at 13.) In response, Rite Aid offers an adequate nondiscriminatory reason for Din's termination: she was "a difficult employee at best, [who] had told Shannon Lee . . . that she was going to look for another job, and Shannon Lee had taken her at her word and made arrangements to replace her." (Id.) The burden then shifts to the EEOC to demonstrate that Rite

---

[1] Although *Reeves* involved a motion for judgment as a matter of law, the Court explicitly noted that "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." 530 U.S. at 150 (citations omitted).

Aid's proffered reason is not worthy of credence "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### A.    *Fuentes* Prong One

In discrediting Rite Aid's proffered reason – the first *Fuentes* prong – the EEOC "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citations omitted). "While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Id.* (citations omitted).

The EEOC attempts to carry this "difficult burden" by arguing that the two main components of Rite Aid's proffered reason – (1) that Din resigned and Byan was hired to replace her, and (2) that Din was a poor employee – could be deemed unworthy of credence by a reasonable factfinder. Regarding the alleged resignation, Din admits that she told Lee in September 2002 that she might look for another job. However, in explaining that she later changed her mind, Din implicitly acknowledged that she did not actually mention her change of heart to anyone:

> When I passed my exam, she [Lee] said, "We cannot afford more than $10." And I was okay with that. First I said maybe – that's the time when I said *maybe [I] look for other job*. But then *to myself* I said $10 she's paying me an hour, I like the place, I know everything here. Why I should be moving around [sic]. And I stayed there then.

(Din Dep. at 54:21-55:3 (emphasis added).) Therefore, the EEOC's argument that Lee was not justified in taking Din at her word is unavailing because, at most, it proves that Lee was merely "wrong or mistaken." *Fuentes*, 32 F.3d at 765. Likewise, the two-month gap (from September to November) between Din's statement and her termination does little to undermine Lee's contention that she believed Din intended to find another job. Lee explained at her deposition that she "tried to give [Din] some time to work it out," and finally decided to confront Din after two months. (Lee Dep. at 86:24-87:11.) Although Lee said she does not know why she did not act sooner (id. at 8712-22), there is nothing more than attorney argument to suggest that two months is an inordinately long time to wait. That being the case, the court does not believe a two-month gap, without more, is long enough to raise such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Rite Aid's proffered reason that a reasonable factfinder could rationally find it unworthy of credence, *Fuentes*, 32 F.3d at 765, especially given the inherently unpleasant nature of terminating an employee.

The EEOC also argues that Byan was not actually hired to replace Din, but rather that he was hired to replace Huma. The EEOC further contends that two other employees hired in December were the real replacements for Din and another employee lost in November. These contentions are based on the EEOC's interpretation of one of Rite Aid's interrogatory responses, which merely lists various employees' start and end dates, and a work schedule produced in discovery. While the EEOC's theory seems plausible in terms of the interrogatory response, the same cannot be said of

the work schedule, which seems to indicate that Byan transitioned from a part-time schedule to a solid Monday-through-Saturday schedule immediately after Din was terminated. (D.I. 39 at P46-P52.) This may not be conclusive proof that Byan was hired as Din's replacement, but it is no less persuasive than the EEOC's reading of the employees' start and end dates. Thus, the court is once again presented with mere attorney argument as to the interpretation of ambiguous evidence from which no reliable conclusions can be drawn.

Finally, the EEOC argues that Rite Aid's proffered reason is unworthy of credence because Lee did not mention the alleged resignation in an explanatory letter she wrote to Tiano shortly after terminating Din. But, according to Lee, she merely forced Din to follow through on her resignation because she was the source "a lot of customer complaints."[2] (Lee Dep. at 84:23-85:21.) Lee then wrote the explanatory letter to Tiano in order to "clarify some of the issues that may arise by her [Din] . . . ." (Id. at 90:6-7.) When asked why she did not mention Din's alleged resignation in the letter, Lee said she did not think she had to include it because "[i]t is something that is understood." (Id. at 95:16-96:1.) It is not entirely clear what Lee meant by "it is something that is understood." That being said, it is surely plausible that Lee would write a letter to her supervisor outlining the reasons she felt justified in terminating an employee who had changed her mind about resigning. Thus, in light of the overall sequence of events (i.e., Din said she might look for another job, Din asked for time off two months later, Lee terminated Din on the spot, and Lee wrote an explanatory letter to Tiano outlining Din's performance problems), the fact that the letter contains no mention

---

[2] The court notes that this explanation is consistent with Rite Aid's proffered reason: Din was "a difficult employee at best, [who] had told Shannon Lee . . . that she was going to look for another job, and Shannon Lee had taken her at her word and made arrangements to replace her." (D.I. 35 at 13.)

of Din's prior resignation does not seem particularly probative of any falsehoods in Lee's story, and it certainly does not render her story unworthy of credence.

Regarding Din's performance as an employee, the record contains substantial evidence that she was the subject of numerous customer complaints. (See, e.g., Jones Aff., Fawcett Aff.) Moreover, plaintiff's counsel conceded at oral argument that "the record reflects there were issues of performance." (Tr. at 42:8-9.) Thus, neither the fact that Lee told Huma that Din was doing a "good job," nor the fact that Din received a positive performance review from an anonymous customer, some five-dollar gift cards for good performance, and a pay increase for obtaining her pharmacy technician certificate are sufficient facts to establish pretext. *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.") Likewise, the fact that Rite Aid may not have followed its progressive discipline policy in dealing with Din's performance issues does not warrant a finding of pretext. *Martin v. Health Care & Ret. Corp.*, 67 Fed. Appx. 109, 113 (3d Cir. 2003) (nonprecedential) (in response to an allegation that the defendant did not adhere to its progressive discipline policy, the Third Circuit held that "an employer's decision that an incident is serious enough to warrant termination rather than a less severe punishment does not show that the reason for termination is pretextual"). Therefore, the court holds that the EEOC has not cast sufficient doubt upon either individual component of Rite Aid's proffered reason to render it unworthy of credence.

The remaining question is whether Rite Aid changed its proffered reason in such a way that a reasonable factfinder could find it unworthy of credence nevertheless. Much of the court's attention has been focused on a statement in Rite Aid's opening brief:

9

> While it is true that Shannon Lee welcomed [Din's] departure because she regarded [Din] as a poor employee, Zarin Din *was not terminated for disciplinary reasons*, she was terminated because she gave notice that she was leaving, her replacement had been hired, and when she said she had changed her mind, Shannon Lee decided it would be best if she was made to honor her original decision and leave.

(D.I. 35 at 27-28 (emphasis added).) In contrast, the explanatory letter to Tiano contains no indication that Din's prior resignation was part of Lee's decision-making process. Instead, Lee justified her decision by chronicling the difficulties she had with Din over the past year. Moreover, Din's recollection of the November 21 conversation does not seem to include Lee mentioning the prior resignation.[3] Thus, at first blush, it might appear that Rite Aid is now taking a position (i.e., Din was terminated because she resigned) that is different from Lee's original position (i.e., Din was terminated for poor performance/disciplinary reasons). However, as the court explained above, Lee's failure to mention Din's resignation is a relatively minor omission. By the same token, it is not inconsistent or contradictory to say that Din was not terminated for disciplinary reasons (as stated

---

[3]It is not clear exactly what Lee is alleged to have said on the evening of November 21 because Din has recounted several different versions of their conversation. In her January 9, 2003, Charge of Discrimination, Din asserted that "Ms. Lee told me that she was terminating my employment because she disliked me and because I was rude to customers." (D.I. 39 at P10.) This is consistent with Din's handwritten Allegations of Discrimination, dated December 16, 2002. (Id. at P13.) However, in her May 3, 2004, deposition, Din testified that Lee did not give a reason for her decision. (Din Dep. at 48:13-18.) Din also reported at her deposition that she requested a transfer, in lieu of being terminated, but that Lee said, "You are not transferable." (Id. at 38:2-5.) Then, in an affidavit dated August 5, 2004 (which was *after* Rite Aid submitted its opening brief), Din asserted that Lee said, "Well, I'll let you go today so you will have your day off too," "I do not like you," "We cannot afford your pay either," and "Zarin, I actually let you go today so you could celebrate your occasion too." (Din Aff. ¶¶ 19, 21.)

Particularly with respect to the contents of Din's eleventh-hour affidavit, the court believes it would be unfair to allow the EEOC to pick and choose the most favorable version of Din's recollection of the conversation. *See Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists.") Nevertheless, one consistent theme throughout Din's statements is that she has not claimed that her prior resignation was a reason Lee gave for her decision.

in Rite Aid's brief), and also that she had performance issues justifying her termination (as stated in Lee's explanatory letter). Therefore, the court holds that the record evidence is insufficient to discredit Rite Aid's proffered reason under the first prong of the *Fuentes* analysis.

**B.     *Fuentes* Prong Two**

To prevail under the second *Fuentes* prong, the EEOC must "adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." 32 F.3d at 764. For example, the EEOC may carry its burden by adducing evidence that Lee in the past has subjected Din to "unlawful discriminatory treatment," treated similarly-situated non-Muslims more favorably, or discriminated against other Muslims or other protected categories of persons. *Id.* at 765. With that framework in mind, only two pieces of evidence pointed to by the EEOC are even arguably probative of a discriminatory motive: (1) Lee ordering pepperoni pizza for the pharmacy employees, knowing that Din's religious beliefs prevent her from eating pork (Din Dep. at 49:10-51:5); and, (2) Lee terminating Din in response to her request for time off for Eid al-Fitr (id. at 48:2-8).

Apart from those incidents, the remainder of the evidence seems decisively in Rite Aid's favor. Lee's reaction in the summer of 2001 upon learning about Huma's religious beliefs is particularly revealing:

>   Q    Did you ever experience any religious discrimination while you were working for Rite Aid?
>
>   A    No. There was nothing that – my religion never came into play while I was there. Because in the summer we don't have anything going on. So there wasn't really anything there, except for maybe food-wise. But other than that, nothing else.
>
>   Q    Well, why don't you tell me about the food-wise part?

11

> A      I had just mentioned – that's how I guess Shannon [Lee] and Susan [Yoder] got to know I was Muslim, because pepperoni pizza. And so they had ordered it once. I said, "I can't have any because I don't eat pork." They asked why. I said, "Well, I'm Muslim and we don't eat pork and things like that." That was the first summer I worked there. I just mentioned briefly I was Muslim and that was the reason.
>
> Q      You mentioned that to whom?
>
> A      To Shannon, because she was the one who ordered the – if she ever ordered food, it was for the pharmacy techs and for her.
>
> Q:     What did she say in response, if anything?
>
> A:     Oh, no. They were just questioning like, "Oh, okay, so – oh, that's interesting" and things like that. Actually it came up one time. It was hot or something. And, you know, I don't wear shorts or tank tops or anything for modesty reasons. And they questioned that. I told them modesty is a part of our religion, that's why I try to stay covered.
>
> Q:     What did they say to that?
>
> A:     "Wow, that's kind of amazing. Because it gets so hot here in Delaware, the East Coast." That was really it. It was something new to them.

(Huma Dep. at 12:11-13:19.) Lee's reaction to this information cannot reasonably be said to reveal religious bias. None of the words used during this exchange are overtly reflective of bias. In addition, though the use of so-called "code words," i.e., words that are seemingly innocuous but actually reflect bias, is well known, comments such as "oh, that's interesting" and "that's kind of amazing" cannot be reasonably placed in that category.

Huma testified further on Lee's reaction later in her deposition:

> Q      By the way, on this pizza discussion, do you think there was any intention by Shannon Lee to slight you because of your religion by ordering pepperoni pizza?
>
> A      Maybe not the first time. But it happened again. And I can't recall if it was once or twice. But she mentioned – she was like, "Oh, well, I'm in the

12

> mood" – she had said it at least one time to me that, "Oh, well, I'm in the mood for pepperoni pizza, so that's what we're ordering." And Susan was there. And I stayed quiet. I was, "Okay. Fine." Even though she had asked all of us what we were in the mood for.

(Id. at 25:12-23.)

> Q   Did Shannon Lee ever do or say anything that you regarded as discriminatory on the basis of religion?
>
> A   She had never said anything directly.
>
> Q   Did she do anything?
>
> A   I mean, the pizza thing and the food issues, like oh, well, you know . . . Kind of I don't care attitude. But, you know, being an employee, just ignore that. And the confusion about the whole – why I don't wear shorts and things like that, modesty reasons, the first time I had spoke to her. So I just ignored that as well.
>
> Q   That was simply a matter of confusion or just not knowing what –
>
> A   They just thought – they thought it was odd. Because they were like, "Well, how do you bear the heat and things?" And they were like, "Oh, wow. We could never do that." I don't know. I just kind of left it at that. 34-35.

(Id. at 34:20-35:13.) While it is true that Lee's "I don't care" attitude might reveal that she is insensitive, it is likewise not indicative of an anti-Muslim bias. In fact, Din reported that Huma and Lee had a "very good" relationship. (Din Dep. at 12:11-12.) Indeed, their relationship must have been somewhat positive because Lee re-hired Huma in the summer of 2002. Suffice it to say, the record contains no evidence that Lee discriminated against other Muslims.

Moreover, Lee's more favorable treatment of Yoder (e.g., Lee discouraged Din from doing more work than Yoder; Din was terminated without warning as a result of her performance problems, whereas Yoder was merely threatened with termination and given an opportunity to correct her absenteeism; etc.) does not permit such an inference either. Although *Fuentes* teaches

that more favorable treatment of non-protected persons can be indicative of discrimination, the record reveals that Lee hired several other non-Muslims besides Yoder. Yet, the EEOC presents no evidence regarding Lee's treatment of those employees. If Lee treated them the same way she treated Yoder, then an inference of discrimination might be warranted. Conversely, if Lee treated them the same way she treated Din, then such an inference might not be warranted. However, without that evidence, the court cannot allow the EEOC to argue to the factfinder that Yoder's more favorable treatment is evidence of discrimination. *Simpson v. Kay Jewelers*, 142 F.3d 639, 646-47 (3d Cir. 1998) ("Simply stated, to show that [the defendant's] proffered reasons were pretext, [the plaintiff] can not pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she.") Likewise, the (vaguely-alleged) fact that Lee treated Din "roughly," or that Lee was sometimes "unapproachable," is not probative of discrimination in the absence of evidence regarding Lee's treatment of other employees. The same is true of the fact that Lee instructed Din to clock out for her fifteen-minute breaks (Din Dep. at 81:12-83:3) because there is no indication that Lee gave different instructions to the non-Muslim employees (or that Lee even knew her instructions were contrary to Rite Aid policy).

In short, the overwhelming weight of the evidence demonstrates that the pepperoni pizza incident and the timing of Din's termination amount to no more than scintilla of evidence in the EEOC's favor. Thus, the court holds that no reasonable factfinder could conclude that "discrimination was more likely than not a motivating or determinative cause" of Din's termination. Consequently, because the EEOC cannot carry its burden under either prong of *Fuentes*, summary judgment in Rite Aid's favor must be granted.

## VI.   CONCLUSION

For the above-described reasons, the court will grant Rite Aid's motion for summary judgment.

Dated: December 12, 2005



UNITED STATES DISTRICT JUDGE

FILED

DEC 1 ? 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                        )
                                   )
    Plaintiff,                     )
                                   )   C.A. No. 03-CV-777-GMS
    v.                             )
                                   )
RITE AID CORPORATION,              )
                                   )
    Defendant.                     )

## ORDER

IT IS HEREBY ORDERED THAT:

    The Defendant's motion for summary judgment (D.I. 34) be GRANTED.

Dated: December __12__, 2005



UNITED STATES DISTRICT JUDGE

FILED

DEC 1 2 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE